KELLWOOD COMPANY, Appellant,

v.

Quay GIBSON, Appellee.

Supreme Court of Tennessee.

May 7, 1979.

Rehearing Denied June 11, 1979.

Sidney W. Spragins, Jackson, for appellant; Spragins & Murchison, Jackson, of counsel.

Pat H. Mann, Jr., Brownsville, for appellee.

## OPINION

BROCK, Justice.

This is a workmen's compensation case. The employer appeals from the decree of the Chancellor awarding to the employee benefits for temporary total disability from May 28, 1975, to August 4, 1975, medical expenses incurred and benefits for 60% permanent partial disability to the body as a whole. The employer contests the Chancellor's conclusion that the accident arose out of and in the course of the employee's employment and also the Chancellor's finding of permanent partial disability. We affirm the decree of the Chancellor.

At the end of the work shift on May 28, 1975, the plaintiff, along with other employees, was leaving the manufacturing plant of the defendant in which she worked when she received the injury. A heavy downpour of rain had just occurred prior to the end of the work shift and surface water from this heavy rainfall had collected on the parking lot owned and maintained by the defendant for the use of its employees. The parking lot was paved but had several deep potholes in the pavement. The heavy accumulation of surface water from the downpour filled the potholes and prevented their disclosure to the plaintiff as she was walking from the building where she worked toward the car in which she was to ride home and which was parked upon the defendant's parking lot. She stepped into one of the deep potholes causing her to fall with great force to the pavement, thereby receiving the injuries which she alleges have disabled her.

The defendant has sought to avoid liability upon the theory that the plaintiff's accident did not arise out of and in the course of her employment. This insistence is without merit; the facts of this case clearly bring the accident within the ambit of liability as set out in *Aluminum Company of America v. Baker,* Tenn., 542 S.W.2d 819 (1976); *Frazier v. Normak International and Chubb-Pacific Indemnity Group,* Tenn., 572 S.W.2d 650 (1978); *Potts v. Heil-Quaker Corporation,* Tenn., 482 S.W.2d 135 (1972). In fact, this case for all practical purposes is indistinguishable from *Aluminum Company of America v. Baker, supra.*

In the instant case, the parking lot was owned and maintained by the defendant employer expressly for the purpose of providing a parking area for the automobiles used by its employees in going to and from work. A handbook, styled "Welcome! Let's Get Acquainted," issued by the defendant employer to its employees, including the plaintiff, contained the following provision:

"Parking Lot—

"At the end of the working day, Southern's numerous employees are walking through our congested parking lot; so drivers must use extreme care when leaving the plant area. A speed limit of 15 miles per hour in entering and leaving the plant ground is enforced. Spinning of tires, excess speed, etc. are safety hazards and necessitate disciplinary action. Only park in specified areas. Your cooperation in this matter will be greatly appreciated."

The evidence shows that there was no other place for defendant's employees to park near its plant other than the parking lot maintained and provided by it for their use. Its parking lot was restricted to use by its employees and there is no way to exit the building in which the plaintiff works without crossing the parking lot where she fell. These facts bring the case squarely within the "required or furnished route" rule and the "special hazard" rule as defined in *Aluminum Company of America v. Baker, supra,* in which we said:

"We think the plant location and the concomitant unavailability of public parking areas for ALCOA's employees, the fact that ALCOA built and maintains parking lots for its employees, the location of the parking lots, the restricted access to the parking lots, and the fact that an employee has to pass through the parking lots to gain access to the plant through the guard gate has the practical effect of making the parking lots a part of the premises of ALCOA which the employees are required to use for ingress and egress. Further, we think the evidence supports the conclusion of the trial judge that the use of the north parking lot subjected appellee to a special hazard known to ALCOA, the very hazard that caused appellee's fall." 542 S.W.2d at 821.

Clearly, the Chancellor decided the issue of liability correctly.

The other question presented is whether there is any evidence to support the finding of the trial court that the plaintiff received a 60% permanent partial disability to her body as a whole. Shortly following the fall above mentioned, the plaintiff began to suffer pain in the area of her low back. She was treated by a Dr. J. T. Craig, an ortho-

pedic surgeon selected by the employer, who treated her from June 6, 1975, to April 13, 1976. Because of the injuries suffered, petitioner was off work from May 29, 1975, through August 4, 1975. After she returned to work, her pain and other symptoms recurred. The plaintiff is a 53-year-old woman with an eighth grade education who worked for the defendant from 1960 through April, 1976, as a sewing machine operator. Since she was injured, the plaintiff has been unable to do her household chores or to assist her husband in his operation of a nursery, as she did prior to the injury. According to Dr. Craig the injuries suffered by her aggravated a pre-existing arthritic condition of her low back.

Dr. Craig, the treating physician and the only medical witness who testified at the trial, stated that, assuming that the plaintiff is experiencing pain as she testified she was, she would be unable to do the type of work required of her employment with the defendant which included "lifting, moving bundles about at work and sitting for a long period of time." He further stated that he had no reason whatever to disbelieve the plaintiff's complaints. With respect to the effect of the work upon her symptoms, he stated:

> "Mrs. Gibson was off work for a time after her fall, and during that period of time she appeared to have improved. She went back to work, and after she had been back to work for several weeks, she began to have pain and symptoms she was having before, but she did go back to work."

At another point the doctor testified as follows:

"Q. Is it your opinion that the discomfort that she had was caused by a muscle strain or ligament strain?

"A. I believe it did start this way, yes.

"Q. Do you think that it continued to be caused . . .

"A. (Interposing) We do know that individuals back strains that are acute can become chronic in nature, yes.

"Q. Pain is, in your judgment, caused by muscle strain?

"Q. Yes.

"Q. Is a muscle strain something you ordinarily expect a patient to recover from?

"A. Normally through the course of time, the pain from a muscle strain does improve, yes.

"Q. Do you have any reason to believe that that won't be true in Mrs. Gibson?

"A. All I can say is that it has been over a year now, and she is still having some pain, at least she was in April. I couldn't say that she won't get better sometime in the future. I can't foresee the future.

\*  \*  \*  \*  \*  \*

"Q. Well, we are concerned with permanency and the  . . .

"A. (Interposing) Well, as I stated, when she—in talking to her, when she didn't do prolonged sitting, standing, bending or stooping, she has improved, and when she went back to work, the symptoms of pain came back. Of course, in another year this may improve further. I can't predict.

"Q. When you stated that you didn't feel that she had any permanent impairment, is that—do you confine that solely to the impairment of function?

"A. Of function, that's correct.

\*  \*  \*  \*  \*  \*

"Q. When, in your opinion, did she receive maximum improvement from the injury which she described to you?

"A. In July of 1975.

"Q. Would that be July 28, 1975, date that you saw her?

"A. That is correct."

Although the testimony of Dr. Craig leaves much to be desired, construing it most favorably to the conclusion reached by the trial judge, as we must, it may be considered sufficient to support the conclusion that the plaintiff suffered a permanent

partial disability to her body as a whole. Of course, once permanency and causation are established by medical testimony, the *extent* of such disability may be determined from lay testimony and other evidence as well as from medical evidence. The ultimate determination in this respect rested heavily upon the credibility to be given to the plaintiff, herself, of whom the trial judge stated that he was very favorably impressed with her frankness and apparent honesty. We cannot say that this ultimate conclusion that she suffered a permanent partial disability of 60% of the body as a whole is without foundation in the evidence. Accordingly, we must affirm. *Smith v. Hale,* Tenn., 528 S.W.2d 543 (1975). We find no error; the decree of the trial court is affirmed. Costs are adjudged against the appellant.

HENRY, C. J., and COOPER, J., concur.

FONES, J., separate opinion concurring in part, dissenting in part in which HARBISON, J., concurs.

FONES, Justice, concurring in part, dissenting in part.

I respectfully dissent.

I agree with the majority opinion on the issue of liability.

I do not agree that Dr. Craig expressed the opinion that plaintiff has a permanent partial disability. *See Owens-Illinois, Inc., Forest Products Division and The Aetna Casualty and Surety Company v. Lane,* released December 27, 1978, Eastern Division.

There being no other expert medical testimony, I would reverse the award of sixty percent permanent partial disability awarded by the trial judge.

I am authorized to state that Justice Harbison concurs in this opinion.