# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

|                                         |   |                                          |
|-----------------------------------------|---|------------------------------------------|
| **CAROLYN MARTIN LOVE**,                | ) | Shelby County Circuit Court              |
|                                         | ) | No. 80298 T.D.                           |
| Plaintiff/Appellee.                     | ) |                                          |
|                                         | ) | C.A. No. 02A01-9803-CV-00053             |
| VS.                                     | ) |                                          |
|                                         | ) |                                          |
| **SHELBY COUNTY, TENNESSEE**,           | ) |                                          |
|                                         | ) |                                          |
| Defendant/Appellant.                    | ) |                                          |
|                                         | ) |                                          |

**FILED**

**November 18, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable George H. Brown, Jr., Judge**

**Carroll C. Johnson**, Memphis, Tennessee
Attorney for Defendant/Appellant.

**Joseph Michael Cook**,
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Defendant Shelby County appeals the trial court's judgment which awarded Plaintiff/Appellee Carolyn Martin Love $123,991.22 in benefits under the County's on-the-job injury policy. Most of the trial court's judgment represented permanent disability benefits and was based upon the court's finding, after conducting a bench trial, that Love had sustained a one hundred percent (100%) permanent disability to each of her arms as a result of her on-the-job injuries. We affirm.

The dispute in this case focused on the extent of Love's disability from carpal tunnel syndrome and related problems. At trial, Love testified that she was fifty-three years of age and had a high school (GED) education. Love began working for the Shelby County Circuit Court as a deputy clerk in 1987. Prior to that time, Love's work experiences were primarily clerical. In January 1994, Love was promoted to the position of principal court clerk in Division VIII. Among other duties, this position required Love to operate a computer and to lift large docket books weighing as much as forty pounds. Approximately forty percent of Love's job duties involved lifting.

In July or August 1994, Love began to notice a tingling sensation in her hands. Love first sought treatment from Dr. Stanley Patterson, who treated Love for carpal tunnel syndrome. Per the County's instructions, Love was evaluated by an occupational medicine doctor, A. Ritchie Lewis, in November 1994. The report of Dr. Lewis indicated that he believed Love to have "right upper extremity MusculoSkeletal Disorder." Dr. Lewis noted that Love had symptoms of carpal tunnel syndrome but that she also had symptoms involving the other two nerves of the right upper extremity. Dr. Lewis did not believe that carpal tunnel surgery alone would completely correct the problem. In addition to recommending a course of treatment to include an anti-inflammatory agent, a mild diuretic, and wrist splints to be worn at night, Dr. Lewis recommended that Love not be required to do any data entry work or work with docket books during her treatment.

Love testified that, over a period of time, her hand and arm problems made it increasingly difficult for her to perform her job duties, which required her to copy, staple, stamp, and file documents, to operate a computer, and to retrieve and carry the large docket books. As Love's condition worsened, she had to use both hands to operate a stapler. In August 1995, she was referred to Dr. Riley Jones, who began treating Love for carpal tunnel syndrome and tendinitis. Dissatisfied

with her progress under Dr. Jones' care, however, Love eventually sought treatment from Dr. Joseph Boals in April 1996. In December 1996, Love underwent surgery performed by Dr. Boals' partner, Dr. Owen B. Tabor, to correct the carpal tunnel syndrome in Love's right arm.

Despite the corrective surgery, Love testified that she continued to experience pain in both arms, beginning in the hands and "running up the forearms" to the elbow and even the shoulder. Love gave the following description of her condition at the time of trial:

> I have . . . pain on a daily basis. . . .
>
> . . . .
>
> Pain that comes down through here and this thumb, this whole part of the thumb, this last little finger, I have pain in the wrist, both sides of the wrist here, the forearms, it runs up the forearms and then this part of the elbow is where it hurts on both arms, then I have the shoulder -- where it runs up here, I don't know if that is a muscle or what in there right at the neck on both sides but the right being the predominant, more pain so than the left.

As for her ability to perform her job duties, Love testified that:

> I can't lift anything with any weight to it, I can't use a stapler, I can't do things that you take for granted. There is no way I could lift those docket books, use a computer, typewriter. Things that I thought nothing of before in my workplace of doing, I can't do anymore.

Love also testified that her condition had affected her ability to perform simple tasks at home:

> There is a lot of things I can't do at home anymore. My husband does the majority of anything done there. I can't do the mopping, the vacuuming, the buying -- well I buy the groceries, I go to the grocery store, but he has to be there to unload them. When I go, if I sit down on the couch or recliner, how most people do when they get up, they use their hands to put the weight to bring their arms up to help lift them up, I can't do that. I have to get on the edge of a couch and use sort of my arm to help raise me up. I can't use -- I can't put the weight on my wrist and hands in order to get up from a couch or recliner, anything soft like that.

Love's husband, Bobby Love, corroborated this testimony, stating that, throughout the day, he was required to come to Love's assistance any time she needed something of any weight

lifted or moved, even if the object weighed only a few pounds, such as a pot of soup. Because of Love's condition, her husband also performed the household chores, such as vacuuming and gardening. Prior to Love's injury, she and her husband enjoyed playing tennis, bicycling, fishing, and boating. Love's husband testified that Love no longer could participate in any of these activities. Love's testimony was corroborated further by her coworkers, who testified that they observed Love experience difficulty in using the computer and in lifting and carrying file jackets, blotters, and docket books.

Three expert witnesses testified by deposition. Orthopedic surgeon Riley Jones testified that he treated Love from August 1995 to February 1996. After the initial examination, Dr. Jones diagnosed Love as having (1) biceps tendinitis, (2) tendinitis at the wrist and mild carpal tunnel, and (3) chondromalacia of the knee. Dr. Jones treated Love with medications, wrist splints, and "a prescription for a computer rest." A November 1995 EMG performed at Dr. Jones' request revealed "a very slight carpal tunnel on the right, normal on the left." During Love's last visit in February 1996, however, Dr. Riley noted that she was "doing much better" and was "having no real pain."

Joseph C. Boals, III, another orthopedic surgeon, testified that he treated Love at the Office of Bone and Joint Surgery beginning in April 1996. At that time, Love related generalized complaints of "wrist pain and numbness consistent with carpal tunnel syndrome," as well as complaints of "forearm soreness" and "tenderness in the posterior left shoulder and into her neck." Dr. Boals diagnosed Love has having (1) incidental finding of mild cervical arthritis, (2) incidental finding of AC joint arthritis, (3) subacute pericapsulitis left shoulder, and (4) suspect bilateral carpal tunnel syndrome. An EMG performed on Love confirmed that she had mild carpal tunnel syndrome on both sides. Dr. Boals initially treated Love's condition with a diuretic and night splints. Ultimately, however, Dr. Boals recommended surgery to release the transverse carpal ligament on Love's right side. This surgery was performed in December 1996 by Dr. Boals' partner, Dr. Owen B. Tabor. Dr. Tabor's notes indicated that, prior to the surgery, he warned Love that the surgery would "not reliably help any of her more proximal arm or shoulder pain."

After the surgery, Love developed deQuervain's tendinitis in her left hand, apparently

because of her increased use of the left hand. Love later developed deQuervain's tendinitis in her right wrist as well. Dr. Boals and Dr. Tabor were able to treat Love's tendinitis condition, but they cautioned Love that the condition might return if she used her hands repetitively. Love also complained to Dr. Tabor "of aching pain in her arms primarily in the proximal forearm and elbow with some radiation on the extensor aspect of the forearm to the hand and some proximal radiation to about the mid third of the humerus." It was Dr. Tabor's impression that Love was suffering from a variety of ailments, including (1) tenomyositis proximal forearm, left and right, non-specific, (2) lateral epicondylitis, left and right elbow, and (3) neuralgia upper extremities, poorly localized.

During the remainder of her treatment by Dr. Boals and Dr. Tabor, Love continued to complain of pain, and she also experienced a decrease in her grip strength. Dr. Boals acknowledged that surgery to release the transverse carpal ligament surrounding the median nerve usually eliminated the numbness and pain associated with carpal tunnel syndrome. Dr. Boals also testified, however, that in eighty percent (80%) of cases, the surgery resulted in about a ten percent (10%) loss in grip strength.

In March 1997, Dr. Tabor noted that Love was nearing maximum medical improvement. Dr. Tabor estimated Love's permanent physical impairment "reflecting mild residual weakness in the hand to be 3% of the right upper extremity." In April 1997, Dr. Boals agreed that Love had reached maximum medical improvement. Dr. Boals estimated Love's permanent physical impairment to be ten percent (10%) for each upper extremity. Dr. Boals explained that the right-side impairment was "for grip strength loss" while the left-side impairment was for "a documented median nerve entrapment." According to Dr. Boals, this figure translated into an impairment rating of six percent (6%) for the body as a whole. As for the extent of Love's vocational disability, Dr. Boals "did not feel [Love] could return to work in view of the pain she was having on using the hands repetitively." Dr. Boals believed that "the only job [Love] could qualify for was one wherein the hands were not used at all," and he recommended that Love apply for disability if such a position was not available in her workplace.

On June 17, 1997, Dr. Riley Jones reevaluated Love's condition at the County's request. Noting inconsistencies between Love's complaints of pain and his own observations during

the physical examination, Dr. Jones sent Love to Dr. Paul Cunningham to have another EMG performed. The results of the EMG, which was performed June 24, 1997, indicated that both upper limbs were within normal limits. Because the EMG revealed no electrodiagnostic evidence of carpal tunnel syndrome, Dr. Jones concluded that Love had no physical impairment as a result of this syndrome. In contrast to Dr. Boals' testimony, Dr. Jones testified that the pertinent AMA Guidelines did not provide for an impairment rating for grip strength loss associated with carpal tunnel syndrome. As for Love's ability to use her upper extremities, Dr. Jones testified that:

> Based upon the physical examination that I did when I saw her in June [1997] I don't find anything to keep her from doing much of anything. I didn't find anything that was limiting.

Orthopedic surgeon Paul H. Williams examined Love on June 19, 1997, also at the County's request. Dr. Williams initially reported that:

> My opinion is that [Love] is unable to do the duties of a secretary or a Shelby County Court employee which has to lift heavy books, operate a computer, and use typewriters. She is not capable of using her hands and upper extremities for repetitive duty. I recommend that she retire from her present occupation. I do not have any therapeutic recommendations to make currently.

Dr. Williams later was provided with the results of the June 24, 1997, EMG performed on Love. After reviewing the EMG results, Dr. Williams changed his opinion as to Love's level of impairment. Dr. Williams still believed that Love had some level of impairment, but he testified that:

> I think she can do secretarial work. I don't believe, though, that . . . she ought to . . . have to lift forty and fifty pound books.
>
> . . . .
>
> I believe she is capable of doing other facets of secretarial work.

As for the apparent conflict between Dr. Williams' initial findings and the negative EMG results, Dr. Williams explained that:

I thought she didn't have significant carpal tunnel syndrome but I thought that . . . my findings and her opinions to me were not totally bogus because she still had some numbness of the palmar aspect of the right thumb and index finger but because [of] the EMG studies I didn't think she had significant evidence that she had residual carpal tunnel but she . . . did have some evidence of it.

Another medical doctor, Robert P. Christopher, reviewed Love's medical reports in July 1997, but he did not physically examine Love. Dr. Christopher initially reported that:

[Love] shows evidence of chronic intractable pain in both upper extremities secondary to chronic neuritis. I cannot conceive of any work that she could do that would not require upper extremity function.

For the above reasons, I recommend that she be retired on disability.

After receiving the results of Love's June 24, 1997, EMG, Dr. Christopher concluded that Love's problems did not result from carpal tunnel syndrome or peripheral neuropathy. Dr. Christopher recommended that Love be seen by a rheumatologist for evaluation of the tenomyositis previously observed by Dr. Tabor.

In its final judgment, the trial court awarded Love $8,249.12 in temporary disability benefits, $7,798.10 in medical expenses, and $107,944 in permanent disability benefits. With regard to its award of permanent benefits, the trial court found:

That [Love] has sustained 100% permanent-partial disability to each of her arms as a result of the injuries alleged herein and that [Love] should accordingly have judgment against [the County] in an amount representing Two Hundred (200) weeks for each arm for a total of Four Hundred (400) weeks of permanent-partial disability. [Love] was being paid Eight Hundred Seventy Seven Dollars ($877.00) twice a month (gross) at the time of the reported injury herein on September 13, 1994 which would equate to an average weekly wage of Four Hundred Four and 77/100's Dollars ($404.77) and a weekly compensation rate of Two Hundred Sixty Nine and 86/100's Dollars ($269.86) resulting in a judgment against [the County] for this permanent-partial disability in the total amount of One Hundred Seven Thousand Nine Hundred Forty Four Dollars ($107,944.00).

On appeal, the County challenges only the trial court's award of $107,944 in

permanent disability benefits. Specifically, the County contends that the award is excessive and that, despite Love's continued complaints of pain, the medical proof presented below "does not support or substantiate an award that amounts to one hundred percent disability."

We conclude that this argument is without merit. In fixing the extent of Love's disability, the trial court was not limited to the estimates of anatomical impairment provided by the medical experts. ***Bailey v. Knox County***, 732 S.W.2d 597, 597 (Tenn. 1987). As our supreme court has explained,

> In considering [the issue of the extent of the employee's disability] it must be kept in mind that this Court makes a clear distinction in worker's compensation cases[1] between anatomical impairment as determined by a physician and disability to work which results from such impairment. ***Federated Mut. Implement & Hardware Ins. Co. v. Cameron***, 220 Tenn. 636, 422 S.W.2d 427 (1967). In ***Cameron*** this Court recognized that in determining what may constitute permanent and total disability many pertinent factors should be considered, including the skills, education and training of the employee as well as job opportunities and other factors bearing upon employability. In determining the sufficiency of the evidence to support a finding of disability under the act, once permanency and causation are established by medical testimony, . . . the extent of such disability may be determined from lay testimony and from other evidence as well as from medical evidence. ***Kellwood Co. v. Gibson***, Tenn., 581 S.W.2d 645 (1979). In such cases the trial judge is not bound to accept physicians' opinions of the extent of the employee's disability but is entitled to determine the extent of disability from all of the evidence, both expert and non-expert. ***Trane Co. v. Morrison***, Tenn., 566 S.W.2d 849 (1978); ***Employers Ins. Co. of Alabama v. Heath***, Tenn., 536 S.W.2d 341 (1976).

***Hinson v. Wal-Mart Stores, Inc.***, 654 S.W.2d 675, 677 (Tenn. 1983) (footnote added); ***accord Griffin v. Memphis Community Television Found.***, 748 S.W.2d 87, 89 (Tenn. 1988).

In fact, "while expert testimony may be used to establish vocational disability, it is not required." ***Perkins v. Enterprise Truck Lines, Inc.***, 896 S.W.2d 123, 127 (Tenn. 1995). "The extent of vocational disability can be established by lay testimony." ***Id***. In this regard, the "employee's own assessment of her physical condition and resulting disability is competent

---

[1]Shelby County has not elected to accept the provisions of the Tennessee Workers' Compensation Law, but the County has its own on-the-job injury policy under which it uses the Workers' Compensation Law as a guide. *See* T.C.A. § 50-6-106(5) (1991).

testimony that should be considered." ***Collins v. Howmet Corp.***, 970 S.W.2d 941, 943 (Tenn. 1998).

Of the three experts who testified in the present case, only one expert testified that he rated Love as having no impairment. Another expert opined that, while Love had some unspecified level of impairment, she could perform most of her former duties, with the exception of lifting heavy books. The testimony of the third expert, however, differed significantly from that of the other two. Dr. Boals assigned Love an impairment rating of ten percent (10%) for each upper extremity and six percent (6%) for the body as a whole. Dr. Boals testified that Love could not return to work because she experienced pain when she used her hands repetitively. According to Dr. Boals, Love could perform a job only if it did not involve use of the hands "at all."

Dr. Boals' testimony was supported by the lay testimony of Love, her husband, and her coworkers. Love testified that her condition caused her pain on a daily basis and that it prevented her from performing routine tasks which she once took for granted. Love further testified that she could no longer perform the duties of her job, such as operating a computer or typewriter, lifting docket books, and even using a stapler. This testimony was corroborated by that of her husband and coworkers, who observed Love experience difficulty in performing routine job duties and household chores. At the time of trial, Love was fifty-three years of age and possessed a high school (GED) education. Her prior work experiences were primarily clerical. Under these circumstances, we conclude that the evidence supports the trial court's finding of a 100% permanent disability to each arm. ***See, e.g.***, ***Collins v. Howmet Corp.***, 970 S.W.2d 941, 943-44 (Tenn. 1998); ***Hinson v. Wal-Mart Stores, Inc.***, 654 S.W.2d 675, 677 (Tenn. 1983).

The trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the County, for which execution may issue if necessary.

_____

FARMER, J.

_____

CRAWFORD, P.J., W.S. (Concurs)

HIGHERS, J. (Concurs)